PRATHER et al. v. LA RUE.

No. 32863.   Feb. 24, 1948.

Rehearing Denied March 30, 1948.

*191 P. 2d 214.*

Frank Nesbitt and Nelle Nesbitt, both of Miami, L. Keith Smith, of Jay, and E. H. Beauchamp, of Grove, for plaintiffs in error.

Riley Q. Hunt, of Jay, for defendant in error.

ARNOLD, J.   This is a suit by William H. La Rue against Ed Elliott and Alice Elliott to reform a deed and to quiet title, and against J. W. Prather and Della Prather and other defendants named to cancel certain deeds and to quiet plaintiff's title to the lands covered thereby. Judgment was entered for plaintiff, and all defendants, except Ed Elliott and Alice Elliott, appeal.

Plaintiff's petition contains two causes of action, the first being in substance that on June 24, 1939, by written contract, Ed Elliott and wife Alice Elliott agreed to sell and convey to William H. LaRue for $600 the following described lands:

"All that part not taken by the Grand River Dam Authority of the southeast 10 acres of Lot 1 and the east 26.64 acres of Lot 2, Sec. 7, Twp. 24, N. Range 24, E. Delaware County, Okla. containing 25.64 acres";

—that in pursuance of said contract LaRue paid $100 down on the purchase price and executed certain notes for the balance; that said notes were fully paid, and, on January 24, 1942, Elliott and wife delivered to LaRue an abstract of title to the lands above de-

scribed, and a warranty deed, which, through mistake, described the following lands:

"The SE¼ NW¼ Sec. 9, Twp. 23, N. Range 24 E. Delaware County, Okla. containing 40 acres";

—that said error was due to the fact that Elliott was illiterate, could neither read nor write and was uneducated and inexperienced in real estate transactions.

Wherefore LaRue asks that the deed be reformed to describe the lands actually sold and that his title thereto be quieted in him.

The second cause of action alleges that on October 12, 1945, Elliott executed and delivered to J. Q. Prather a quitclaim deed conveying to him the same land which he contracted to convey to LaRue; that Prather induced the execution and delivery of said quitclaim deed by representing to Elliott that same was a paper to correct a defect in the chain of title to the land, by paying Elliott $25, which was less than the normal value of the land, although Prather knew that Elliott had theretofore sold said land to LaRue; that defendants, J. Q. Prather, Della Prather, Clifford Baker, Lucille Baker, F. F. Farbro, and Sadie Farbro make some claim to the land, although their claims are void.

Answer of Ed Elliott admits the allegations of the petition and in addition thereto alleges that on October 12, 1945, J. Q. Prather, whom he had known for 30 years and in whom he had confidence, came to his home and represented that he had bought the land in question from LaRue, but there was a flaw in the title and to avoid a suit to quiet title, he wanted him to sign a paper to cure this defect; that in reliance on these representations he signed the paper by mark, which paper, he later learned, was a quitclaim deed and that Prather's representations were false; that he would not have signed same had he known it was a quitclaim deed for the land. He asks that such

decree be entered as may be just and equitable.

Answer of J. Q. Prather and Della Prather denies all allegations of the petition except those admitted; admits that Ed Elliott can neither read nor write, but alleges that nevertheless he is a shrewd and successful business man; that he has accumulated considerable property and is amply able to protect his interest in business dealings; admits that Elliott executed and delivered a quitclaim deed to Prather conveying the land in question, which deed has been recorded; denies any fraud was perpetrated on Elliott to procure said deed and alleges that same was obtained in good faith, for a good and valuable consideration, based on the record title to said land which was then in Elliott.

The answer alleges that on November 30, 1945, Prather and wife conveyed a part of said land to F. F. Farbro, and on January 3, 1946, conveyed the remainder thereof to Clifford Baker; that both deeds were for a good and valuable consideration, and that both deeds were immediately thereafter recorded.

Wherefore said defendants ask that said action be dismissed at plaintiff's cost.

Answer of Clifford Baker and Lucille Baker first contains a general denial; admits that J. Q. Prather and wife executed and delivered to them a deed for part of the lands in question for the purchase price of $3,000, and alleges that they bought said land in good faith, for a good and valuable consideration, without notice or knowledge of any claims thereunto by plaintiff.

By cross-petition said defendants ask that their title to said lands be quieted in them.

Answer of F. F. Farbro and Sadie Farbro first contains a general denial; admits that J. Q. Prather and wife executed and delivered to them a deed for the remainder of the lands in ques-

tion for the purchase price of $350 paid, and alleges that they bought said lands in good faith, for a good and valuable consideration, without notice or knowledge of any claims thereunto by plaintiff.

By cross-petition said defendants ask that their title to said lands be quieted in them.

None of the defendants pleaded estoppel by conduct as against plaintiff.

By plaintiff's reply to the answer of Ed Elliott, he adopted all of the allegations of said answer and made them a part of his petition. His replies to the separate answers of the other defendants were general denials.

The written contract of sale and purchase of the lands here involved, executed June 24, 1939, acknowledged the receipt by Ed Elliott and wife of $100 cash and the execution and delivery to them by plaintiff of three promissory notes due, respectively, June 24, 1940, 1941, and 1942. These notes were promptly paid at maturity. This contract was not acknowledged and not entitled to be recorded.

Subsequent to the execution of this contract of sale, the sequence of events material to the issues in the case are these: On December 28, 1941, defendant Prather wrote a letter to the plaintiff from Grove, Oklahoma, which reads:

"Grove Okla
"Dec 28 41

"Mr. W. M. Larue
    "My Dear Sir

"I have a 5 acre tract of land leading to highway from your 26 acres in Sec. 7-24-24 (Ed Elliot) I would trade you this land for 3 A on the South side of yours this would Give you Building Site on Electric Line and Highway. The Road situation has Killed the sales on lake side tracts I have land on the west & south of you

"Yours Resp
    "J Q Prather
        "Box 963 Grove Okla"

On January 24, 1942, Ed Elliott and wife went to Southwest City, Missouri, for the purpose of executing a warranty deed to the plaintiff to the lands here involved, but through mistake of the scrivener who prepared the deed, it purported to convey 40 acres of land in section 9, township 23 N., range 24 East. This deed was delivered by Elliott to the Delaware County Bank at Jay, together with the abstract covering the lands here involved, to be delivered by the bank to the plaintiff upon payment of the final note on June 24, 1942.

On June 26, 1942, the bank at Jay wrote to the plaintiff as follows:

"We have your letter of the 22nd enclosing your check in the amount of $197.28 to retire the enclosed note in full. We are also enclosing a Warranty Deed and Abstract No. 746 covering .36 and .65 acres in the SE in 724-24. I will ask that you send us your check for $2.00 for postage and expenses due us."

Plaintiff received the letter enclosing the deed and abstract, and after examining the abstract to see that it covered the land he had purchased, put the deed and abstract with the letter away and mailed to the bank his check for $2, as requested in the bank's letter, to reimburse the bank for expenses paid.

Thereafter, in July of 1942, plaintiff visited the lands which he had purchased, found the same occupied by a man named Prather whom he made his tenant and left him in possession. On this visit, plaintiff went over the land and examined the same for building sites and made some slight repairs on the fence so that the same would turn cattle.

On March 14, 1944, defendant Prather wrote to plaintiff from Grove, Okla., as follows:

"do you want to sell your 27. A Near this Place Am in The Real Estate Buis And if so would like to list your land. Have 60 acres 1-2 Miles west

of your Place good Rock Road. Mail line about 600 ft. shore line Fine Timber $1200.00 This is a good investment"

On June 1, 1944, Prather wrote a letter to the plaintiff which reads:

"You have some land in Sec 7 - 24-24 two Miles S W of this Place I am in the Real Estate Business Do you wise to sell this land have a Party who would be interested at $1-000.00 or will trade you 70 1-2 Mile West of your land 600 ft shore line all in Heavy timber on a Good Gravel Road. RR & school Buss Line"

On July 21, 1944, in cause No. 1071, civil, pending in the United States District Court for the Northern District of Oklahoma, an order was entered for service of notice in condemnation. This order was published and soon after that date Prather mailed a copy of the published order to plaintiff and on the bottom thereof wrote the following:

"Van, I see on page 4 your suit for condemnation on the 7 ft. was filed against Ed Elliott & wife instead of you and your wife. Is your deed on record?"

On July 31, 1944, the plaintiff in answer to this message from Prather wrote a letter to Prather, the material language of which is:

"Glad to hear from you. Thanks for the papers. Everything has been taken care of in regard to deed. What is the news from Grove, if any? What do you think would be the lowest figure that would buy the 5 A North of Me; also the 5 A. City dump. Also the 10 A belonging to your nephew adjoining me on the west. Who owns the N.W. 10 A of Lot 1 North of your nephews place and west of the dump With a little clearing a person might run 2 or 3 cows on some of that land."

Subsequent to the execution of the deed by Elliott and wife at Southwest City, Missouri, and its delivery to the bank at Jay, Ed Elliott left the state and went to the State of Washington, not returning to Delaware county until August, 1945. He left no forwarding address. If plaintiff had discovered the error in his deed promptly, Elliott's unknown whereabouts would have rendered any effort at correction futile at that time.

On July 31, 1944, plaintiff wrote a letter to the Delaware County Bank at Jay enclosing a check for $5 together with a correct warranty deed properly describing the lands covered by his purchase contract with the request that the bank get in touch with Ed Elliott and get this deed executed and acknowledged. Owing to the absence of Elliott from the state, the bank was unable to locate him for the purpose of having the corrective deed executed and subsequently returned the same to the plaintiff with this information. It thus appears that plaintiff acted promptly when he discovered the error.

In the early part of July, 1944, the plaintiff visited the town of Grove and went upon the land which he had purchased, taking with him Mr. Prather, who was acquainted with the location of the lines and corners of the land, to have the latter assist him in locating them.

On October 12, 1945, defendant Prather went to the home of Ed Elliott and there procured the quitclaim deed which is the subject of plaintiff's attack under his second cause of action. This deed was duly recorded.

The deed from Prather to Farbro was executed in October 18, 1945, and the deed from Prather to Baker was executed in January, 1946.

During a period of four years by letters, personal conversation, and association, defendant Prather had recognized the plaintiff as the owner of the land by purchase from Ed Elliott. How he came to change his mind as to plaintiff's ownership of the land is shown by the following question and answer on his direct examination:

"Q. What caused you to conclude, if you did, he didn't own this property, it belonged to Mr. Elliott? A. Well, the way he acted when I tried to get him to price it. He said it wasn't in no

condition to sell, something that way. When I sent him those condemnation papers and asked him if he did have a deed to put it on record, that it was selling, the Grand River Dam Authority was taking seven feet of it, and I watched the record. He didn't put anything on record I figured he didn't have a deed, in fact, he acted like he didn't have any."

On October 12, 1945, defendant Prather went to the office of Dennis Beauchamp, an attorney and notary public of Jay, Okla., where he had the latter prepare a quitclaim deed covering the land here involved by filling in the blanks on a printed form of quitclaim deed. Putting this deed in his pocket, and accompanied by Mr. Beauchamp and by Mrs. Halterman, who was returning to her home in Grove in Mr. Beauchamp's car, the defendant Prather proceeded to the home of Ed Elliott near the town of Grove, arriving there late in the afternoon. The car was parked near a little stream a quarter of a mile from the home of Ed Elliott and the two men proceeded to the house on foot leaving Mrs. Halterman in the car. As to what occurred when the two men reached Elliott's house is in dispute and in irreconcilable conflict. Elliott's version of the conversation then had is thus stated from the witness stand:

"He brought up the subject of buying a piece of land from Mr. LaRue down on Elm Branch, and he said he bought it and Mr. LaRue was in Kansas City when he bought it. There seemed to be a flaw in the title and he wanted me to sign some papers to take that flaw out. He said there was a flaw in the title. So, I knowed him a long time, didn't know nothing bad about him, and so I said, 'I don't want to get into any trouble; Mr. LaRue is a good man and he paid me for that land.' He said, 'Oh there is nothing wrong about your signing a little piece of paper and it saves me $250.00. If it goes to court it would cost two hundred or two hundred and fifty dollars.' He said he would appreciate it, so I made a mark for my signature."

Defendant Prather testified in regard to this conversation as follows:

"Q. What did you tell Elliott that paper was? A. I told him, quitclaim deed. Q. And did you tell him what land was included in that quitclaim deed, and what land was being conveyed by it? A. Yes. Q. What did you say in that regard? A. I told him, 26 acres he previously owned on Honey Creek."

Mr. Beauchamp testified on this point:

"Q. Now, then, Mr. Beauchamp, I will ask you to state then if Mr. Prather plainly told him what this paper was? A. He did, he says, 'I want a quitclaim deed to the land west of Grove.' Q. A quitclaim deed? A. Then Mr. Elliott made some remark—he guessed he had just as well get rid of it, you couldn't make a living on it. never had made him any money. I believe that is the way he put it."

There is no substantial conflict or contradiction in the evidence on any material matter involved in the case until we reach the question of the good or bad faith of defendant Prather, in securing Ed Elliott's signature to the quitclaim deed on October 12, 1945.

It is conceded in the briefs of plaintiffs in error that if Prather secured Elliott's signature to the quitclaim deed by such misrepresentations and deceit as would make its execution forgery in the second degree under 21 O.S. 1941 §1593, that not only Prather's deed, but the deeds of Farbro and Baker are void by reason of the statute. They contend, however, that if Prather's deed is merely voidable because of fraud in its procurement, then the deeds of Farbro and Baker are valid because they had no actual or constructive knowledge of the plaintiff's claim to the land. This requires a determination as to whether the conflicting evidence, together with the reasonable inferences to be drawn therefrom, discloses that Elliott's signature was obtained by Prather under circumstances which would make it forgery in the second degree.

Why did Prather tell Elliott that the land he wanted a quitclaim deed to was the "26 acres he previously owned on Honeycreek?" Elliott knew that he had previously sold this land to the plaintiff and had been paid therefor. Elliott says that Prather told him he had bought the land from LaRue and that there was a flaw in the title which the quitclaim deed would correct. To an illiterate and uneducated mind, a most natural thought would be that the execution of two deeds to the same land to two different persons might cause trouble, and a most potent influence in allaying this fear would be the information that the person seeking the second deed had acquired the title represented by the first deed. When Elliott informed Prather and Beauchamp that he would have to sign by mark, the three went from the house to the car where Mrs. Halterman was waiting, taking with them a little ten year old nephew of Elliott's. This was done in order to have two witnesses to the signature by mark. Notwithstanding Elliott was so illiterate and uneducated that he had to make his signature by mark, neither the defendant Prather, nor the notary, Beauchamp, read to him the instrument which Elliott was to sign nor did they explain to him the contents thereof. After Elliott had made his mark in the presence of the two witnesses, Elliott says that Prather then told him he was going to give him $25 as it would cost him $200 or $250 if he had to go to court to clear the title. Elliott replied that he didn't need to do that. Mrs. Halterman testified that it was getting late and she was in a hurry to get home, so she didn't pay much attention to what was said at the car, but she did hear the old gentleman say "You don't need to do that." This deed executed under the circumstances and in the manner above shown was placed of record the next day.

Considering the probabilities of the situation thus presented, the motives which actuated the parties and the interests to be subserved, we think the reasonable inferences to be drawn therefrom lend verity to the version of Ed Elliott. In fact, the conclusively established facts, some of which are admitted by Prather, corroborate the testimony of Elliott and establishes clearly that the quitclaim deed from Elliott was procured by fraudulent misrepresentation.

The determination of the trial court that said deed was procured in violation of 21 O.S. 1941 §1593, which provides:

"Every person who, by any false representation, artifice or deceit, procures from another his signature to any instrument, the false making of which would be forgery, and which the party signing would not have executed had he known the facts and effect of the instrument, is guilty of forgery in the second degree"

—and that the procurement thereof constituted forgery in the second degree is not clearly against the weight of the evidence tested by the rule that evidence of fraud must be shown by proof which is clear, cogent, and convincing.

See Baldridge v. Sunday, 73 Okla. 287, 176 P. 404; Julia Oil & Gas Co. v. Cobb, 128 Okla. 260, 262 P. 650; Wooldridge v. Powers, 178 Okla. 56, 61 P. 2d 734; Pittsburg Coal & Mining Co. v. Wright, 122 Okla. 210, 253 P. 487.

Affirmed.

HURST, C.J., DAVISON, V.C.J., and BAYLESS, WELCH, GIBSON, and LUTTRELL, JJ., concur.